**TACSIS LAW APC**
John S. Manzano (SBN 170546)
F. Richard Manzano (SBN 106026)
Lorrie A. Walton (SBN 161908)
Ryan M. Arakawa (SBN 315181)
3424 W. Carson Street, Suite 600
Torrance, CA 90503
T: (424) 234-5200
E: law@tacsis.com

*Attorneys for Defendants and Third-Party Plaintiffs,*
*TACSIS APC f/k/a TACSIS LLC, and KENT LIMSON*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| LITTLEJOHN FINANCIAL SERVICES, INC., an Oregon Corporation; and FRED DAVID LITTLEJOHN II, an individual,<br><br>Plaintiffs,<br>v.<br><br>TACSIS APC, a California professional stock corporation; TACSIS, LLC, a California limited liability company; and KENT LIMSON, an individual,<br><br>Defendants.<br><br>TACSIS APC, a California professional stock corporation f/k/a TACSIS LLC, a California limited liability company; and KENT LIMSON, an individual,<br><br>Third-Party Plaintiffs,<br>v.<br><br>ALL NET, LLC, a Nevada Limited Liability Company; JACKIE ROBINSON, an individual; DRIBBLE DUNK, LLC, a Nevada Limited Liability Company; AGS ASSURETY, LLC, a Nevada Limited Liability Company; TIMOTHY J. ARELLANO, an individual and individual surety; and ROES 1 THROUGH 100 INCLUSIVE,<br><br>Third-Party Defendants. | Case No:   2:25-cv-02990<br><br>**THIRD-PARTY COMPLAINT FOR:**<br><br>1. **CONTRACTUAL INDEMNITY**<br>2. **CONTRIBUTION**<br>3. **DECLARATORY RELIEF** |

1    Pursuant to Fed. R. Civ. P. 14, Defendants/Third-Party Plaintiffs TACSIS APC, a

2    California professional stock corporation f/k/a TACSIS LLC, a California limited liability

3    company and KENT LIMSON, an individual (collectively hereinafter, "THIRD-PARTY

4    PLAINTIFFS") hereby bring a Third-Party Complaint against Third-Party Defendant ALL NET,

5    LLC, a Nevada Limited Liability Company; JACKIE ROBINSON, an individual; DRIBBLE

6    DUNK, LLC, a Nevada Limited Liability Company; AGS ASSURETY, LLC, a Nevada Limited

7    Liability Company; TIMOTHY J. ARELLANO, an individual and individual surety; and ROES 1

8    THROUGH 100 INCLUSIVE (collectively hereinafter, "THIRD-PARTY DEFENDANTS"), and

9    allege as follows:

10                                     **PARTIES**

11    1.    Defendant/Third-Party Plaintiff TACSIS APC, a California professional stock

12    corporation f/k/a TACSIS LLC, a California limited liability company (hereinafter, "TACSIS") is

13    a professional stock corporation organized and existing under the laws of the State of California

14    with its principal place of business in Torrance, California.

15    2.    Defendant/Third-Party Plaintiff KENT LIMSON, an individual (hereinafter,

16    "LIMSON") is an individual who resides in the County of Los Angeles, State of California and is

17    a citizen of the State of California.

18    3.    THIRD-PARTY PLAINTIFFS are informed and believe and thereon allege that

19    Third-Party Defendant ALL NET, LLC, a Nevada Limited Liability Company (hereinafter,

20    "AN") is a limited liability company organized and existing under the laws of the State of Nevada

21    with its principal place of business in Las Vegas, Nevada.

22    4.    THIRD-PARTY PLAINTIFFS are informed and believe and thereon allege that

23    Third-Party Defendant JACKIE ROBINSON, an individual (hereinafter, "ROBINSON") is an

24    individual who resides in the County of Clark, State of Nevada and is a citizen of the State of

25    Nevada.

26    5.    THIRD-PARTY PLAINTIFFS are informed and believe and thereon allege that

27    Third-Party Defendant DRIBBLE DUNK, LLC, a Nevada Limited Liability Company

28

(hereinafter, "DD") is a limited liability company organized and existing under the laws of the State of Nevada with its principal place of business in Las Vegas, Nevada.

6.      THIRD-PARTY PLAINTIFFS are informed and believe and thereon allege that Third-Party Defendant AGS ASSURETY, LLC, a Nevada Limited Liability Company (hereinafter, "AGS") is a limited liability company organized and existing under the laws of the State of Nevada with its principal place of business in Las Vegas, Nevada.

7.      THIRD-PARTY PLAINTIFFS are informed and believe and thereon allege that Third-Party Defendant TIMOTHY J. ARELLANO, an individual and individual surety (hereinafter, "ARELLANO") is an individual who resides in the County of Clark, State of Nevada and is a citizen of the State of Nevada.

8.      The true names and capacities, whether individual, corporate, associate, or otherwise of defendants designated as ROES 1 through 100, inclusive, are presently unknown to THIRD-PARTY PLAINTIFFS, who therefore sue said defendants by such fictitious names. THIRD-PARTY PLAINTIFFS will seek leave of this Court to amend this Complaint to show the true names and capacities of said defendants when the same become known, or according to proof at trial. THIRD-PARTY PLAINTIFFS are informed and believe, and thereon allege, that each of the third-party defendants designated herein as a ROES 1 through 100 engaged in the same conduct as the other third-party defendants, and are responsible in some manner for the events and happenings herein referred to, and that their actions and/or negligence proximately caused the injuries and damages sustained by THIRD-PARTY PLAINTIFFS as herein alleged, either through said third-party defendants' own conduct or through the conduct of their agents, servants or employees, or due to their ownership, control, rental, use, sale, maintenance, repair, construction, or lease of any instrumentality by which THIRD-PARTY PLAINTIFFS' injuries were caused, or in some other manner.

9.      THIRD-PARTY PLAINTIFFS are informed and believe and thereon allege that each of the THIRD-PARTY DEFENDANTS, including ROES 1 through 100, is the agent of the other, and that each of their acts was authorized, ratified, and approved by the other. All THIRD-PARTY DEFENDANTS, including ROES 1 through 100, are hereinafter collectively referred to

as "THIRD-PARTY DEFENDANTS", and individually, a "THIRD-PARTY DEFENDANT".

## JURISDICTION AND VENUE

10.    The Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity between the parties and the amount in controversy exceeds $75,000.00.

11.    This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because the claims against THIRD-PARTY DEFENDANTS are so related to the claims in the Complaint brought by LITTLEJOHN FINANCIAL SERVICES, INC., an Oregon Corporation (hereinafter, "LJFS") and FRED DAVID LITTLEJOHN II, an individual (hereinafter, "LITTLEJOHN") (collectively hereinafter, "PLAINTIFFS") that they form part of the same case or controversy.

12.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to THIRD-PARTY PLAINTIFFS' claims occurred in this District.

## FACTUAL BACKGROUND

13.    This case concerns a lending opportunity built on fraud and a Ponzi scheme stemming over ten years, targeting whoever would fall for the scheme and provide loan funding for an alleged lucrative project which was to be built on the Las Vegas strip called the All Net Resort and Arena (hereinafter, the "ALL NET PROJECT") in Las Vegas, Nevada.

14.    The ALL NET PROJECT was described as a prospective elaborate basketball arena and family resort which was to be built on the real property generally located on Las Vegas Boulevard South and Paradise Road, 900 feet south of Sahara Avenue (hereinafter, the "PROPERTY"), otherwise known as a portion of the famous Las Vegas Strip.

15.    At the center of this fraudulent scheme is ROBINSON, who lured individuals into loaning funds to his entity for the project with the promise of high interest, quick repayment and foolproof lending; the scheme ran like this:

a.    The funds were initially loaned to AN, and were to be personally guaranteed by ROBINSON, individually and concurrently backed by "performance bonds" issued by AGS and by ARELLANO as an individual surety. AGS was held out to be a bonding company claiming to have over $600,000,000 in liquid asset funds under bank deposit with only nominal

claims outstanding. ARELLANO was alleged to have been securely insured with general liability and excessive errors and omissions insurance coverage. Foolproof indeed.

b.    Immediately after receipt of the funds in AN's account, most, if not all, the funds were transferred into DD's account, an account controlled by ROBINSON.

c.    ROBINSON would then pay out portions of the funds to ARELLANO, who never secured a single bond via himself nor AGS; pay out large sums of money to ANLD for the rental and/or rights to purchase the PROPERTY; pay funds to TORBEN WELCH, an individual (hereinafter, "WELCH") for his services, pay out monies to ROBINSON and ROBINSON's spouse; and pay out monies to ROBINSON's various friends and family as "consultants," providing them lush "consultant fees," as well as generous Thanksgiving, Christmas and other bonuses, all the while knowing that the ALL NET PROJECT itself was facing a huge multi-million dollar deficit and was ready to collapse any day as it had no serious commitment building loans needed to properly fund the project.

16.    Between the dates of August, 2014 and through December, 2019, ROBINSON, through the assistance of AGS, ARELLANO, and others, had received no less than $800,000,000 in "short term" loans which were never paid as promised. Such loans were obtained on the basis of the same material misrepresentations to encourage and solicit the loans, usually, the story being a great return on investment, quick returns on the money and fool proof repayment backed by multiple bond sureties. On no less than four known occasions, ROBINSON even provided written equity percentage ownership agreements in the overall ALL NET PROJECT to get the loans ROBINSON wanted, including one to LIMSON.

17.    In 2018, ARELLANO contacted LIMSON to fundraise for ROBINSON. To that end, ARELLANO inquired whether LIMSON was interested in providing some short-term loans to the ALL NET PROJECT. ARELLANO targeted LIMSON, a CPA in Los Angeles, to exploit LIMSON's access to wealthy individuals who were always looking for good return on investment opportunities. ARELLANO explained to LIMSON that due to the delay in receiving billions of dollars in previously approved building funds, which was to happen any day, that smaller short-term "bridging loans" were needed in the interim to keep the ALL NET PROJECT afloat until the

1    main funding arrived.

2          18.    ARELLANO next introduced LIMSON to ROBINSON to further discuss the ALL

3    NET PROJECT and its desire to obtain interim funding via these short-term "bridging loans."

4    Following such introduction and dialogue, PLAINTIFFS performed investigation and due

5    diligence and during the course of such due diligence, PLAINITIFF was provided proof of signed

6    multi-billion dollar building loan agreements for building funds, various Certificates of Insurance

7    reflecting ARELLANO and AGS's general liability and excess errors and omissions policy

8    coverages, and written assurance by way of a trust account administrator who provided

9    verification of the amount and location of such funds that AGS was financially stable and able to

10   pay any claims to cover the needs of PLAINITFF's loans if there was a default on the loans.

11         19.    PLAINTIFFS were informed that several of ROBINSON's entities—such as All

12   Net, LLC; All Net Development, LLC; and All Net Land Development, LLC—were set up for

13   various "holdings" in the overall  ALL NET PROJECT and in anticipation of the finalized ALL

14   NET PROJECT, and that AN, would be the parent company which would ultimately "own" and

15   manage the project. ANLD, owned by the Lowden family, would be the owners of the project,

16   holding the main luxury owner's box, front and center in the arena.

17         20.    PLAINTIFFS were informed that while each of the various ALL NET entities

18   were participants in the ALL NET PROJECT, the loans were to be wired to the main AN account

19   and that the contracts would be written up with AN as the parent entity for the ALL NET

20   PROJECT. It was further disclosed that while an "old" entity existed, one ROBINSON had set up

21   many years prior for his past projects, DD, this entity was not to become a part of the ALL NET

22   PROJECT as everything else had been set up in the various ALL NET entity name structure, yet

23   it was ultimately where most of the funds were funneled for distribution by ROBINSON.

24         21.    LIMSON's father-in-law, Dr. Jon-Marc Weston, was a financial planning client of

25   LJFS and LITTLEJOHN for several years.

26         22.    During this period, LITTLEJOHN provided financial planning services for the

27   Weston family, which is how LIMSON was first introduced to LITTLEJOHN. LITTLEJOHN

28   was also Dr. Weston's tenant, financial advisor, and even the executor of Dr. Weston's estate.

23.    In late 2018, LITTLEJOHN expressed an interest in learning more about the All-Net Stadium Project, and in turn, Dr. Weston provided LIMSON's contact information to LITTLEJOHN.

24.    Thereafter, LIMSON and LITTLEJOHN communicated to discuss the ALL NET PROJECT, and LITTLEJOHN's client—Plaintiffs CHERI PIKE and CAROLE MACHADO, as Co-Trustees of The Carole A. Machado Revocable Living Trust (hereinafter, the "MACHADO TRUST")—ultimately elected to invest in the ALL NET PROJECT, a decision that was made primarily based off of LITTLEJOHN's recommendation.

25.    As a part of his further due diligence efforts and as time progressed, THIRD-PARTY PLAINTIFFS would periodically inquire of the use of the funds and the names of the parties involved in the ALL NET PROJECT, including the architect, the construction heads and the other lenders in the ALL NET PROJECT. THIRD-PARTY PLAINTIFFS visited the PROPERTY several times and personally met with ROBINSON at the on-site construction trailer. Everything presented to THIRD-PARTY PLAINTIFFS by THIRD-PARTY DEFENDANTS gave the appearance of legitimacy of the ALL NET PROJECT.

26.    At one point during the transaction, as a further assurance of the safe investment of the loans, LIMSON was included in a three-way telephone call with DAVID LOWDEN, an individual (hereinafter, "LOWDEN"), President and Managing Member of ALL NET LAND DEVELOPMENT, LLC, a Nevada Limited Liability Company (hereinafter, "ANLD"), whose family owned the PROPERTY under their entity, ANLD.

27.    About a year prior to LIMSON's involvement, the Lowden family had transferred the land from the name, SAHARA LAS VEGAS CORP, (hereinafter, "SAHARA"), to ALL NET LAND DEVELOPMENT, as a newly formed, cohesive named entity to match the ALL NET scheme.

28.    During that call, LIMSON was informed by LOWDEN that the Lowden family, as owners of the ALL NET PROJECT site location, were also invested in the ALL NET PROJECT, and everything was good to go and was moving forward smoothly, and that they would hold the main "owner's box" once the stadium was built, giving the appearance to LIMSON that the

Lowden family was, in fact, a part of the entity structure.

29.    As further enticement and assurance of the loan payback, THIRD-PARTY PLAINTIFFS were provided a series of documents which included verification of the liquidity of the AGS bonds which held over $600,000,000 in available bank reserves, including some minor outstanding claims.

30.    THIRD-PARTY PLAINTIFFS received performance bonds as security for the loans, which THIRD-PARTY PLAINTIFFS would later learn through discovery were fraudulent forgeries. Not a single bond was ever issued.

31.    THIRD-PARTY PLAINTIFFS ultimately provided a series of seven (7) loans (collectively, the "LOANS") to the ALL NET PROJECT. The terms of the loans were embodied in seven similar written contract agreements which contained specific use terms and rights to UCC-1 assurances. These loans totaled $2,144,200.00 and were made over the course of six months in late 2018 through early 2019. As part and parcel to the fifth loan, and as a further incentive to delay repayment on the previous four smaller loans, which had already entered the default stage, LIMSON was given 1/10th of 1% overall equitable ownership in the ALL NET PROJECT in perpetuity, which was presented as being worth potentially millions of dollars in the future as the popularity of the stadium grew, as well as a written employment contract which would become effective once the ALL NET PROJECT became operational.

32.    THIRD-PARTY PLAINTIFFS received from AGS and ARELLANO a notarized trust receipt verifying funds in the sum of $627,500,000.00 which was readily available in a local bank in the event any claims were submitted against the bonds purchased to protect the loans noted herein. Over time, and as a further inducement to obtain additional funds from THIRD-PARTY PLAINTIFFS, ROBINSON would make small and inconsistent payments towards the existing LOANS and even went so far as to enter into extension agreements and a Memorandum of Understanding as a showing of good faith that ROBINSON and AN intended to pay the balances due under the LOANS with full interest once the building fund loans were received although neither ROBINSON nor any of the THIRD-PARTY DEFENDANTS ever intended to repay the LOANS. These acts were nothing more than means to an end in THIRD-PARTY

DEFENDANTS' elaborate Ponzi scheme.

33.     Theretofore and thereafter, THIRD-PARTY PLAINTIFFS sought to recover payment for the LOANS via the related performance bonds. Yet over the course of several months, THIRD-PARTY PLAINTIFFS' efforts were stonewalled by various persons, including but not limited to ROBINSON, ARELLANO, AGS, and attorney ALISA J. STEINHAUER, who made repeated representations that it was represented and confirmed that the bonds were issued and insured, that the bond claims were being investigated.

34.     In order to avoid court action, THIRD-PARTY DEFENDANTS requested a further opportunity to provide payment to THIRD-PARTY PLAINTIFFS under the LOANS. To that end, on or about December 11, 2019, ANDREW MASON, claiming to be the Trustee of the AGS Assurety Investment Trust, executed a notarized affidavit asserting that AGS "has on its books of cash/cash equivalent assets with a value of *Six Hundred and Forty-Three Million Dollars 00/100 US Dollars ($643,000,000),* which shall be held and allocated for Individual Surety Bonds written against the trust of which *Seventy-Eight Million Seven Hundred and Fifty Thousand Dollars and 00/100 US Dollars ($78,750,000)* in outstanding bond liability is currently written against the trust."

35.     In or about March 2020, THIRD-PARTY PLAINTIFFS submitted claims against the insurance policies identified in the Certificates of Insurance that ARELLANO and AGS provided in connection with THIRD-PARTY DEFENDANTS' representations that the performance bonds were insured by Admiral Indemnity Insurance Company, Twin City Fire Insurance Company, and Arch Specialty Insurance Company. Said Certificates of Insurance were provided concurrently with letters purporting to represent and confirm that the performance bonds had been issued. Only one of the insurance companies—Twin City Fire Insurance Company—responded to THIRD-PARTY PLAINTIFFS claim, and denied coverage in or about April 2020.

36.     Following THIRD-PARTY DEFENDANTS' breach of the LOANS and surety agreements, and failed agreements to pay and further stall the inevitable, THIRD-PARTY PLAINTIFFS initiated their lawsuit in the Los Angeles County Superior Court, case number 20STCV41938 (hereinafter, the "CALIFORNIA ACTION").

37.    After conducting discovery in the CALIFORNIA ACTION, it became evident that it was something much more than simply defaulted loans; it was clearly fraud and a Ponzi scheme. More specifically:

a. It was discovered that the LOANS were never used for the ALL NET PROJECT, and were instead used as payouts to ROBINSON, ARELLANO, and all of ROBINSON's various "consultants" on the project, including a $60,000.00 check earmarked as a Christmas bonus to ROBINSON himself, a bonus to his spouse, and bonuses to each of ROBINSON's "consultants."

b. It was discovered that the amounts paid to the consultants were commensurate with the value of the loan received. ARELLANO received huge "premium" payoffs; monies never used to secure the bonds as promised.

c. It was discovered that LORING JACOBS, an individual (hereinafter, "JACOBS") was a doctor and would encourage and solicit loans from his doctor friends/associates for ROBINSON, and for each loan received, JACOBS would receive a bonus or commission.

d. It was discovered that not one 1099 tax payment form, for over ten years of payments in the millions to these "consultants," was ever issued on the funds which were paid to all these persons.

e. It was discovered that the surety bonds, which were to be guaranteed by AGS and ARELLANO were fraudulent and/or forged, despite AGS and ARELLANO having collected premiums that were paid for at the time each of the LOANS funded.

f. It was discovered that both of the errors and omissions insurance proof coverage were false and that the general liability policy only covered a small chocolate shop in Utah which ARELLANO ran on the side.

g. It was discovered that ARELLANO received huge "premium" payoffs and that monies given to him and to AGS were never used to secure the bonds as promised.

h.  It was discovered that the notarized verification of available bond funds signed by Andrew Mason was a forgery as Andrew Mason was non-existent (like many of the other construction loan signatories for which ROBINSON had provided false loan documents supporting the any day funding loans.)

i.  It was discovered that ANLD assisted and participated in the preparation and filing of a Memorandum of Lease and Option to Purchase, reflecting that ROBINSON had certain land use and purchase rights, when at various times he did not and, in fact, was in serious delinquencies most of the time during his occupancy on the land, giving any potential lender the false sense of viable land rights for use by the project;

j.  It was discovered that the land use permits were all in the name of ANLD, as evidenced by various filings with the Clark County Commission for the land use permits which were signed by LOWDEN and notarized, along with the land use attorney's letter clearly stating that they represented ANLD while standing before the Clark County Commission seeking extensions to continue "their" (i.e., ANLD's) project. Contrary to these representations to the Clark County Commission, LOWDEN now contends that putting the land use permits in ANLD's name were "in error."

k.  It was discovered that in a similar series of transactions, THIRD-PARTY DEFENDANTS utilized the same short-term loan and equity scheme to secure multiple loans for the ALL NET PROJECT. The facts surrounding this series of transactions are described in the Complaint filed by CANCER CARE FOUNDATION, INC., a Nevada Non-Profit Corporation against DD, AN, and others in the Clark County District Court, case number A-24-886923-C. These acts involve the same scheme and methods involved in the subject enterprise.

l.  It was discovered that in a similar series of transactions, THIRD-PARTY DEFENDANTS utilized the same short-term loan and equity scheme to secure multiple loans for the ALL NET PROJECT. The facts surrounding this series

of transactions are described in the Complaint filed by MMV INVESTMENTS

LLC, a Delaware limited liability company against DD, AN, ROBINSON, and

others in the Clark County District Court, case number A-21-844680-B. These

acts involve the same scheme and methods involved in the subject enterprise.

m. It was discovered that in a similar series of transactions, THIRD-PARTY

DEFENDANTS utilized the same short-term loan and equity scheme to secure

multiple loans for the ALL NET PROJECT. The facts surrounding this series

of transactions are described in the Complaint filed by NEXT STEP

VENTURE LTD., an Anguilla International Business Corporation against DD,

AN, and others in the Clark County District Court, case number A-24-886942-

C. These acts involve the same scheme and methods involved in the subject

enterprise, all orchestrated by WELCH in setting up the fake banks which were

to provide such funding.

38.    Prior to conducting discovery in the CALIFORNIA ACTION, it was unbeknownst

to THIRD-PARTY PLAINTIFFS that ANLD's now alleged true purpose was only to facilitate

the sale of the PROPERTY through the transfer of membership shares for a financial savings

between the landlord (i.e., ANLD) and the tenant (i.e., DD), and that the Lowdens were the

landlord of the PROPERTY rather than owner/partners in the ALL NET PROJECT, as presented.

39.    ANLD's true purpose is completely contradictory to what was previously

represented to THIRD-PARTY PLAINTIFFS —i.e., that the various ALL NET entities were set

up in anticipation for certain aspects of the ALL NET PROJECT. In fact, although AN and

ANLD were actually set up in the earlier phase of the project, ANLD had only formed less than a

year prior to THIRD-PARTY PLAINTIFFS' LOANS, and the ownership title itself had been

transferred and recorded from SAHARA to ANLD, all in an effort to mislead and confuse any

potential lender to misunderstand the true relationship between the parties.

40.    For ANLD and himself, LOWDEN claims to have no involvement in the

fraudulent activities of the other THIRD-PARTY DEFENDANTS and that ANLD was merely

the landlord of the PROPERTY. Yet, it was LOWDEN himself who personally prepared the

various leases and amendments thereto, giving the false illusion that ROBINSON was in good

standing on the lease (when he was not), and that ROBINSON had the purchase and building

entitlement rights to the PROPERTY (when he did not); that ROBINSON was in "good standing"

on his option to purchase with the LOWDENS, when in fact he was not, and that the LOWDENS

would charge ROBINSON large "fees of reinstatement" in order to falsely mislead potential

lenders that ROBINSON'S financial position was stable, when instead, the only "right" that

ROBINSON held in relation to the PROPERTY was the right to do some initial grading per the

Clark County Commission. Anything beyond that would require ROBINSON to seek further

approval from the Commission to move forward with the ALL NET PROJECT, which it could

not, due to the continued lack of building funds.

41.    Further, it was ANLD and LOWDEN who would benefit from all the monies

which were actually placed in the ALL NET PROJECT as the entitlements to the PROPERTY

followed the PROPERTY itself once ROBINSON was removed due to ROBINSON's inability to

pay further rent and/or land purchase rights from ANLD.

42.    LOWDEN's actions on behalf of ANLD were certainly as an agent, an ostensible

agent, and/or an apparent agent of the various All Net entities involved and/or purportedly

involved in the ALL NET PROJECT, whether intentional or grossly negligent, to give the

appearance that ANLD was a partner of the ALL NET team involved in the ALL NET PROJECT

in light of all the circumstances and involvement performed by LOWDEN.

43.    Both before and after the inception of the CALIFORNIA ACTION, THIRD-

PARTY DEFENDANTS sought to convince THIRD-PARTY PLAINTIFFS that the ALL NET

PROJECT was legitimate, that the performance bonds were legitimate, that funding was

imminent, and that the full balance due to THIRD-PARTY PLAINTIFFS was to be paid. By way

of example and not of limitation:

        a.    In or about November, 2018, ROBINSON, ARELLANO, and AGS provided

            documentation through Attorney Michael G. Byers to THIRD-PARTY

            PLAINTIFFS, stating that AGS and ARELLANO were, *inter alia*, "ready,

            willing and able to provide financial guarantee for surety bonds" and that

"AGS has current outstanding liabilities of $3,268,074.22, with a total of $650,000,000 of available assets."

b. In or about October, 2019, ARELLANO and AGS provided correspondence that, *inter alia*, stated that they were investigating the claims against the performance bonds and would respond within 45 business days.

c. In or about November, 2019, Attorney Alisa J. Steinhauer provided correspondence on ARELLANO's and AGS's letterhead that, *inter alia*, asserted a 45 business day period to investigate claims made against the performance bonds and various documents needed to conduct the investigation.

d. In or about December, 2019, ANDREW MASON, claiming to be the Trustee of the AGS Assurety Investment Trust, executed a notarized affidavit asserting that AGS "has on its books of cash/cash equivalent assets with a value of *Six Hundred and Forty-Three Million Dollars 00/100 US Dollars ($643,000,000),* which shall be held and allocated for Individual Surety Bonds written against the trust of which *Seventy-Eight Million Seven Hundred and Fifty Thousand Dollars and 00/100 US Dollars ($78,750,000)* in outstanding bond liability is currently written against the trust."

e. In our about January, 2020, ROBINSON and ARELLANO, through Attorney Alisa J. Steinhauer, represented that ROBINSON and ARELLANO would produce documents that included both evidence that funding for the ALL NET PROJECT had been secured and that ARELLANO and AGS possessed sufficient liquidity to satisfy the performance bond.

f. In or about February, 2020, Attorney Alisa J. Steinhauer represented on behalf of ROBINSON and ARELLANO that the bond was collectible and was insurance for payment.

g. In or about December, 2021, ARELLANO and AGS published multiple documents on their website, including:

i.   A "company profile" touting ARELLANO's 35 years of experience as an individual surety for various projects, including the ALL NET PROJECT, rendering himself an "industry leader" with a reputation for "professionalism and integrity."

ii.  A "letter of third party certification" by Attorney Charles Dominick Lombino purporting to have verified that ARELLANO and AGS had the more than $600,000,000 in assets to support the individual surety bonds issued by ARELLANO and AGS.

iii. A "Certificate of Liability Insurance" purporting to show that National Liability & Fire Insurance Company, Twin City Fire Insurance Company, and Arch Specialty Insurance Company insured ARELLANO and AGS.

iv.  A letter from WELCH on MRLLP's letterhead stating that ARELLANO has substantially complied with Federal and Utah law for issuance of a personal surety bond and that ARELLANO was exempt from licensing or registration requirements as a result to give the allure that AGS and/or ARELLANO stood financially capable to pay any bonds claims in the event of a default.

h.   In or about January, 2022, MRLLP and WELCH provided THIRD-PARTY PLAINTIFFS with documentation allegedly evidencing a non-traditional funding arrangement for the ALL NET PROJECT, which was in place and would be used to pay the full balance due to PLAINTIFFS, plus interest.

i.   In or about June, 2022, AN and ROBINSON represented that the full amount due to THIRD-PARTY PLAINTIFFS, plus interest, would be paid.

j.   In or about August, 2022, MESSNER REEVES LLP, a Colorado Limited Liability Partnership (hereinafter, "MRLLP") represented to THIRD-PARTY PLAINTIFFS that WELCH was handling the financing of the ALL NET PROJECT, and in fact, was the attorney of records for ROBINSON, ANLD,

ARELLANO AND AGS through the initial stages of litigation in the state

action wherein they continued their farse of paying the loans back in order to

dodge having to respond to discovery and/or appear at depositions .

k.  Between 2021 and 2024, engaging in various acts to delay legitimate discovery

culminating in the necessity for a discovery referee, including but not limited

to failing to respond to discovery, failing to adhere to court orders to respond

to discovery, failing to produce documents for deposition, refusing to appear at

depositions, and generally stonewalling legitimate discovery causing the court

to have to appoint a discovery referee due to the refusal to comply to discovery

obligations by the Defendant parties .

l.  For years, representing at public hearings through a plethora of attorneys,

bankers, and others that funding for the ALL NET PROJECT was imminent

and that construction would proceed as advertised.

The collective aim and intent of these tactics are clear—THIRD-PARTY DEFENDANTS

sought to conceal the true nature of the ALL NET PROJECT, and to prevent THIRD-PARTY

PLAINTIFFS from discovering the truth so the DEFENDANTS could  continue their fraudulent

enterprise.

44.    For some time, following receipt of THIRD-PARTY PLAINTIFF's LOANS,

THIRD-PARTY DEFENDANTS continued their Ponzi scheme in borrowing funds from

unsuspecting lenders under similar terms as THIRD-PARTY PLAINTIFFS. Eventually, THIRD-

PARTY DEFENDANTS were unable to find any new lenders and moved to the next stage of

their funding scheme.

45.    The next stage of THIRD-PARTY DEFENDANTS' funding scheme; siphoning

client funds from MRLLP's client trust account under the guise of "investing" the siphoned

funds—of course, without the consent of the clients whose funds were being siphoned. When this

did not work, since he had been caught, WELCH then resorted to a secondary enterprise where he

set up various entities between himself and ROBINSON, including but not limited to, SAFFOLD

MCNEIL, INC. and NOBODY CARES JVE, LLC to give himself a substantial ownership

interest in the ALL NET PROJECT, and if successful, would make himself a billionaire.

46.     To facilitate this secondary enterprise, WELCH associated with several known and convicted felons for the purpose of creating fake lending entities that, in turn, would then market Business Equity Lines of Credit (hereinafter, "BELOC") to businesses to obtain their commission deposit funds to then place them into funding the financially out of control ALL NET PROJECT [See *BKNS v. Messner Reeves LLP* (Utah District Court Case No. 1:24-cv-05581); *Konala v. Messner Reeves LLP* (Utah District Court Case No. 2:24-cv-00195); *Kosher Eats v. Messner Reeves LLP* (California District Court Case No. 2:24-cv-05161); and *Emerald Consulting Partners LLC v. Messner Reeves LLP* ( Orange County Superior Court Case 30-2024-01378580)].  These lending entities would entice businesses seeking BELOC loans; take on huge deposits for the fees on the loans; then default the customer in some manner, a technicality to keep the deposits and never actually fund the BELOC. In effect, the BELOC scheme was an elaborate evolution of how THIRD-PARTY DEFENDANTS defrauded THIRD-PARTY PLAINTIFFS by making promises that THIRD-PARTY DEFENDANTS never intended to keep, simply to line their own pockets. Put another way, this is nothing more than a blatant cash grab by DEFENDANTS. In fact, the "banks" which were to fund these loans were set up by WELCH in various locations throughout the United States. The fraudulent banks included, but were not limited to, FIDES Bank, Clearwater Perpetual Premiere Bank, McMahon Capital, INBE Capital, DPG Investments, Titan Financial and Latham Capital, to name a few. Each of these lenders were really LLCs, set up using a Ponzi person who would pose as "the banker" with significant assets, and would file some documents to make the entity look legitimate

47.     Ultimately, the ALL NET PROJECT ran out of time for its construction deadlines, which, due to its lack of being able to prove adequate and legitimate funding, crumbled as it was nothing more than a house of cards with little to show for the monies invested. In November 2023, the Clark County Commission shut down the project as they too, were tired of hearing about the billions in funding which was to fund "any day," yet had never funded since 2017, when ROBINSON first announced the project was initially funded with a $4,000,000,000 loan from Qatar, signed by an alleged Saudi prince by the name of Abdul El-Basir, who never existed.

48.    In the end, ANLD never sold the PROPERTY to ROBINSON or any of the other DEFENDANTS, despite the numerous promises to the contrary, and the only construction "work" that ROBINSON ever did to bring the ALL NET PROJECT to fruition was some initial grading and excavation of the lot, which resulted in an eyesore on the strip as it was only a hole in the dirt, which would flood and attract mosquitos when it rained. In fact, ANLD has since taken advantage of the property entitlements to try to rebuild the stadium project with other investors.

49.    Instead, THIRD-PARTY DEFENDANTS used most (if not all) of the LOAN funds to line their pockets and live lavish lifestyles with funds that had been fraudulently acquired under the guise of keeping the ALL NET PROJECT alive, with no intent of ever repaying the LOANS, while waiting for building financing that THIRD-PARTY DEFENDANTS knew would never arrive, while continuing to represent that the funding would arrive shortly and that everything was good to go.

50.    As a result, THIRD-PARTY DEFENDANTS victimized THIRD-PARTY PLAINTIFFS (and others) to the tune of millions of dollars over the approximately ten years that passed since the ALL NET PROJECT broke ground, until it was ultimately shut down by the Clark County Commission.

51.    When the Clark County Commission shut down the ALL NET PROJECT in November, 2023, via a motion to deny made by Commissioner Richard Segerblom, Commissioner Segerblom stated that his motion to deny was based on the fact that "time and time again, [ROBINSON, THIRD-PARTY DEFENDANTS, MRLLP, and WELCH] asked just one more year, two years. Let's get this done. We'll get it done. [The Clark County Commission] followed the money everywhere around the world, and truthfully, it hasn't happened."

**ALTER EGO**

52.    AN and DD are, and at all times relevant were, mere shams and shells organized and operated as the alter ego of ROBINSON for his personal benefit and advantage, in that ROBINSON has at all relevant times herein exercised total dominion and control over AN and DD. At all times relevant herein, ROBINSON was the first and only member of AN and DD. At all times relevant herein, ROBINSON owned and/or controlled all ownership interest in AN and

DD. At all times relevant herein, ROBINSON so intermingled his personal and financial affairs with that of AN and DD that AN and DD were, and are, the alter ego of ROBINSON.

### **FIRST CAUSE OF ACTION – CONTRACTUAL INDEMNITY**

#### **(As Against All Third-Party Defendants)**

53.     THIRD-PARTY PLAINTIFFS incorporate paragraphs 1 through 52 of this Third-Party Complaint, as if fully set forth herein.

54.     In or about November, 2018, THIRD-PARTY DEFENDANTS executed a Business Loan and Security Agreement and Financial Loan Guarantee (collectively hereinafter, the "AGREEMENT"), which collectively provide that THIRD-PARTY DEFENDANTS agreed to indemnity THIRD-PARTY PLAINTIFFS against "all loss, costs, damage, liability or expenses (including, without limitation, court costs and reasonable attorneys' fees)" that THIRD-PARTY PLAINTIFFS may sustain or incur "in the prosecution or defense of any action or proceeding concerning any matter growing out of or in connection with this [AGREEMENT] and/or any other documents nor or hereafter executed in connection with this [AGREEMENT] [ . . . ]."

55.     On or about April 4, 2025, PLAINTIFFS brought an action for Oregon Common Law Indemnity (hereinafter, the "COMPLAINT") against THIRD-PARTY PLAINTIFFS relating to the LOANS and the ALL NET PROJECT. THIRD-PARTY PLAINTIFFS refer to the COMPLAINT and incorporates it by this reference, except that THIRD-PARTY PLAINTIFFS deny each and every allegation contained in the COMPLAINT as they pertain to THIRD-PARTY PLAINTIFFS' alleged conduct.

56.     The COMPLAINT arises from the matter of *Cheri Pike and Carole Machado, as Co-Trustees of The Carole A. Machado Revocable Living Trust v. Littlejohn Financial Services, Inc.; et al.* filed in US District Court for the District of Oregon, Eugene Division, case number 6:24-cv-00707-MC (hereinafter, the "OREGON LITIGATION")

57.     As a result of the filing of the COMPLAINT, THIRD-PARTY PLAINTIFFS have been required to retain and have retained legal counsel to defend against PLAINTIFFS' claims and have incurred and will continue to incur expenses for investigation, legal costs, and legal fees, the full amount of which has not yet been ascertained. THIRD-PARTY PLAINTIFFS will

seek leave to amend this Third-Party Complaint to set forth the amounts when known.

58.     THIRD-PARTY PLAINTIFFS are informed and believe and thereupon allege that the damages asserted by PLAINTIFFS in this action arose out of THIRD-PARTY DEFENDANTS obligations under the AGREEMENT and are covered by the express indemnity provision in the AGREEMENT.

59.     If THIRD-PARTY PLAINTIFFS are held liable to PLAINTIFFS, or to anyone else, for damages as a result of the incidents and occurrences alleged in PLAINTIFFS' COMPLAINT, THIRD-PARTY PLAINTIFFS liability would be based solely on a derivative form of liability not resulting from their conduct, but from an obligation imposed on THIRD-PARTY PLAINTIFFS by law; whereas THIRD-PARTY DEFENDANTS, and each of them, intentionally and/or negligently caused the damages complained of in PLAINTIFFS' COMPLAINT and are at fault as a result of their own respective acts and/or omissions. Therefore, THIRD-PARTY PLAINTIFFS are entitled to complete indemnity from THIRD-PARTY DEFENDANTS, and each of them.

## SECOND CAUSE OF ACTION – CONTRIBUTION

### (As Against All Third-Party Defendants)

60.     THIRD-PARTY PLAINTIFFS incorporate paragraphs 1 through 59 of this Third-Party Complaint, as if fully set forth herein.

61.     If THIRD-PARTY PLAINTIFFS are held liable to PLAINTIFFS, or to anyone else, for damages as a result of the incidents and occurrences alleged in PLAINTIFFS' COMPLAINT, the damages, if any, were either wholly or in part directly and proximately caused by the negligence or culpable conduct of THIRD-PARTY DEFENDANTS, and each of them. Each THIRD-PARTY DEFENDANT should be required to pay a share of the damages that is in proportion to the comparative fault and responsibility of that THIRD-PARTY DEFENDANT in causing the damages, and should further be required to reimburse THIRD-PARTY PLAINTIFFS for any payment of damages THIRD-PARTY PLAINTIFFS, or each of them, make(s) in excess of their proportional share, if any, of all parties' fault and responsibility for the damages.

/ / /

## THIRD CAUSE OF ACTION – DECLARATORY RELIEF

### (As Against All Third-Party Defendants)

62.    THIRD-PARTY PLAINTIFFS incorporate paragraphs 1 through 61 of this Third-Party Complaint, as if fully set forth herein.

63.    An actual controversy exists between THIRD-PARTY PLAINTIFFS and THIRD-PARTY DEFENDANTS, and each of them, in that THIRD-PARTY PLAINTIFFS contend and THIRD-PARTY DEFENDANTS deny that if THIRD-PARTY PLAINTIFFS are held liable to PLAINTIFFS, or to anyone else for damages, as a result of the incidents and occurrences alleged in PLAINTIFFS' COMPLAINT, the liability would be based solely on a derivative form of liability not resulting from any action or omission of THIRD-PARTY PLAINTIFFS, but only from an obligation imposed by law; whereas THIRD-PARTY DEFENDANTS, and each of them, intentionally and/or negligently caused the damages complained of in PLAINTIFFS' COMPLAINT and are at fault as a result of their own respective acts and/or omissions.

64.    THIRD-PARTY PLAINTIFFS desire a judicial declaration of the rights and duties of the parties with respect to the matters alleged in this Third-Party Complaint.

WHEREFORE, THIRD-PARTY PLAINTIFFS pray for judgment against THIRD-PARTY DEFENDANTS, and each of them, as follows:

### ON THE FIRST CAUSE OF ACTION

1.    For indemnity as requested herein against any judgment entered against THIRD-PARTY PLAINTIFFS in the COMPLAINT and/or the OREGON LITIGATION and/or any amounts paid or agreed to be paid by THIRD-PARTY PLAINTIFFS by way of settlement of the COMPLAINT and/or the OREGON LITIGATION; and

2.    For complete indemnity against costs and attorney's fees reasonably incurred by THIRD-PARTY PLAINTIFFS in defending against PLAINTIFFS' claims.

### ON THE SECOND CAUSE OF ACTION

3.    For contribution as requested herein against any portion of any judgment entered in this action against THIRD-PARTY PLAINTIFFS, or any amounts paid or to be paid by THIRD-PARTY PLAINTIFFS by way of settlement, which does not fairly reflect THIRD-

1    PARTY PLAINTIFFS' pro rata fault or responsibility, if any

2                    **ON THE THIRD CAUSE OF ACTION**

3         4.       For declaratory relief as requested herein under 28 U.S.C. § 2201 of all the rights

4    and duties of the parties with respect to the matters alleged in this Third-Party Complaint.

5                    **ON ALL CAUSES OF ACTION**

6         5.       For injunctive and equitable relief as the Court may find appropriate;

7         6.       For reasonable attorney's fees;

8         7.       For costs of suit herein; and

9         8.       For any other and further relief as this Court may find appropriate.

10

11   DATED: January 9, 2026                    **TACSIS LAW APC**

12

13                                 By:      /s/ John S. Manzano, Esq.

14                                       John S. Manzano, Esq.
                                         Attorneys for Defendants and Third-Party Plaintiffs
15                                       TACSIS APC f/k/a TACSIS LLC; and KENT
                                         LIMSON
16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on January 9, 2026, I personally served a true and correct copy of the foregoing **THIRD-PARTY COMPLAINT FOR: 1. CONTRACTUAL INDEMNITY; 2. CONTRIBUTION; 3. DECLARATORY RELIEF,** by the following means:

CM/ECF
U.S. MAIL

on the following individuals:

**SNELL AND WILMER LLP**
Clifford S. Davidson, Esq.
350 South Grand Avenue, Suite 3100
Los Angeles, CA 90071
Tel: (213) 929-2500
Email: csdavidson@swlaw.com

*Attorneys for Plaintiffs and Third-Party Defendants,* LITTLEJOHN FINANCIAL SERVICES, INC., an Oregon Corporation, *and* FRED DAVID LITTLJOHN II, an individual.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

                            /s/ Maria España
                            Maria España
                            3424 W. Carson Street, Ste. 600
                            Torrance, CA 90503